Chester W. MORSE

v.

John W. GARDNER, Secretary of Health, Education and Welfare.

Civ. A. No. 14374.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 10, 1967.

Rene Lehmann, Midlo & Lehmann, New Orleans, La., for plaintiff.

Frederick W. Veters, Gene S. Palmisano, Asst. U. S. Attys., for defendant.

HEEBE, District Judge:

## I.

The plaintiff in this case first filed an application on March 26, 1962, with the defendant, seeking to establish a period of disability under 42 U.S.C.A. § 416 (i) and for disability insurance benefits under 42 U.S.C.A. § 423. After hearings by the hearing examiner and review and the taking of additional evidence by the Appeals Council, the final decision of the Secretary of Health, Education and Welfare was a denial of the claimant's application on January 29, 1964, on the grounds that claimant had unreasonably refused remedial surgery and therefore his impairment did not come within the definition of disability as used in the pertinent provisions of the Social Security Act. Plaintiff then instituted this action, on March 26, 1964, to review the

Secretary's determination. The case came before another judge of this Court on cross motions for summary judgment. In an opinion rendered November 6, 1964, the Court found that although the record revealed, and the Secretary's implied finding was, that the claimant's low back condition rendered him actually then disabled within the meaning of the Social Security Act, nevertheless there was no evidence in the record bearing adequately on the question of whether or not the claimant's refusal to submit to surgery for the purpose of remedying his situation was reasonable. Because of the lack of evidence in the record, the Court remanded the case to the Secretary for further proceedings, the taking of additional evidence, and a redetermination by the Secretary as to the question of claimant's refusal to submit to surgery, including "findings, based on medical testimony, as to the precise type of surgery required in this particular case, and the effect of claimant's fear, degenerative back condition and other circumstances on the possible success or failure of that operative procedure in terms of over-all risk." Morse v. Celebrezze, 235 F.Supp. 810 (E.D.La. 1964). The hearing examiner, after conducting a supplemental hearing on remand, rendered a decision again denying the claimant's application on May 21, 1965; the Appeals Council affirmed, July 21, 1965. On July 30, 1965, the Social Security Act, in particular those sections relating to the definition of disability on which this case turns, were amended; for the purpose of reviewing the case in the light of those amendments, the Appeals Council made another review of all the evidence and rendered a final decision on October 27, 1965, again denying the claimant's application.

The only question for our determination, as it was for the court which rendered the first opinion in this matter, is whether or not this petitioner comes within the definition of "disability" as that word is used in §§ 416(i) and 423 of Title 42 of the United States Code.

To be entitled to benefits under either of those sections, a claimant must have become disabled when he was "insured for disability insurance benefits," 42 U.S.C.A. §§ 416(i) (2) & (3), and 423 (c) (1). It was the Appeals Council's finding, and this is not disputed by the plaintiff, that the claimant last worked in the third quarter of 1954, and that he has met the insurance requirement only through and up to December 31, 1956. Nothing in the 1965 amendment abrogated or modified the earnings-insurance requirement, and in any case the claimant is entitled to recovery only if he has shown that his disability began on or before December 31, 1956.

Disability was defined, prior to the recent amendment of the Act, as

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." 42 U.S.C.A. § 423(c) (2)

The regulations adopted pursuant to this statute further refined the concept of disability as follows:

"An individual will be deemed not under a disability, if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity." 20 C.F.R. § 404.1502(g)

The July 30, 1965, amendment to the Act changed the original definition of disability contained in the Act by deleting the alternative "or to be of long-continued and indefinite duration" and inserting in lieu thereof:

" * * * or which has lasted or can be expected to last for a continuous period of not less than 12 months."

II.

Claimant admits that the 1965 amendment to the Act allows recovery of benefits under the new definition of disability only for periods after the effective date of the amendment, and that re-

covery of benefits for periods of disability prior to 1965 must rest on the original wording of the Act. Nevertheless, the claimant does seek recovery from the date of the amendment under the new definition.[1] In this connection claimant contends that since "disability" is now defined to include disability resulting from any impairment "which has lasted or can be expected to last for a continuous period of not less than twelve months," the previous interpretation of disability under the former wording to include only impairments which are not reasonably remedial has no application under the new definition, all that is required being that the disability have "lasted" more than twelve months. Claimant's brief states simply

"The law requires no more: it merely requires that at the date when [claimant] was last meeting the earnings requirements, he was suffering from a disability which had lasted, or could be expected to last, for a period of not less than twelve months."

His conclusion is that since, as of the present time, claimant's impairment has already lasted several years, it must be presumed and it can no longer be contested that, as of the date of the filing of his application the impairment was expected to last for more than a year; in fact, as of the date of the filing of his application for benefits, claimant's impairment had already lasted several years.

■ We reject this simplification. Certainly Congress did not intend, merely by shortening the expected duration of disability which would give rise to benefits from an indefinite period to a one-year period, to allow recovery for remedial conditions on the part of those who refuse to accept a safe and reasonably effortless cure. Congress in fact made it clear that no change was to be wrought in the fundamental requirement that a claimant at least make a reasonable attempt to remedy his condition in order to qualify for benefits. The Senate Finance Committee's Report on the 1965 amendment states:

"An individual with a disability impairment which is amenable to treatment that could be expected to restore his ability to work would meet the revised definition *if he is undergoing therapy* prescribed by his treatment sources, but his disability has nevertheless lasted, or can be expected to last, for at least twelve calendar months. *However, an individual who wilfully fails to follow such prescribed treatment could not, by virtue of such failure, qualify for benefits.*" Report 404, Part 1, p. 99. (emphasis added)

The amendment might perhaps be interpreted as allowing recovery for benefits, by those unreasonably refusing to submit to cure, for the period during which disability could be expected to last should the claimant in fact accept treatment and eventual cure. Although we think the express Congressional intent quoted above would preclude recovery even in that situation, certainly there can be no recovery by a claimant who refuses reasonable remedy for any period beyond the date of prospective cure. The present claimant allegedly became disabled in 1952 or 1956. Should it appear that his condition was remedial and that he unreasonably refused to accept the remedy, we could not award benefits for the years 1965 and following, merely on the basis of lack of evidence on the prospective time for recovery, especially in view of the claimant's failure to come forward with any evidence on the point.

### III.

According to the Court's opinion prior to remand, the Secretary's original finding was at least impliedly that the

1. The theory seems to be that if, in the circumstances of this case, there is a significant difference between "disability" as originally defined and "disability" under the 1965 amendment, the claimant should be able to show that he met the amended definition in 1956 and continuing, but would, if the former definition of disability was not also met, be allowed benefits under the new only for the period subsequent to the effective date of the 1965 amendment.

present claimant was "basically disabled,"[2] and the only issue to be treated on remand was whether or not the claimant's "basic disability" was remedial with "reasonable effort and safety" to himself.[3] As we have indicated, these questions are pertinent under the new, as well as the old definition of "basic disability" in the Act.

■ After an exhaustive review of the record of both the original and supplemental hearings in this case, as well as all the exhibits, the reports of the examiners and the opinions of the Appeals Council, and the briefs of counsel to this Court, we are compelled to reverse the Secretary's decision. This Court is fully aware of its duty in this case, not to render its own version of the facts, but to uphold the agency's findings unless they are (to use the inevitable cliche) "unsupported by substantial evidence on the record as a whole." Mitchell v. Gardner, 123 U.S.App.D.C. 195, 358 F.2d 826 (1966); Alsobrooks v. Gardner, 357 F.2d 110 (5th Cir. 1966); 42 U.S.C.A. § 405 (g). But this Court is not bound, to appropriate the language of a recent Fifth Circuit case, to "abdicate our responsibility to the extent of mere 'rubber-stamping' our affirmance of the [agency's] decision when, after full review of the record, including the evidence opposed to the [agency's] views, we are unable con-

scientiously to conclude that the evidence supporting such decision is substantial." N L R B v. O. A. Fuller Supermarkets, Inc., 374 F.2d 197, 200 (5th Cir. 1967).

We stress the fact that our decision is predicated on an exhaustive examination of the record and a view of that record in its entirety and as a whole. The petitioner-claimant is an illiterate male, 42 years old at the date of the initial hearing, a spotwelder and shipyard worker during the period prior to the onset of his disability. He testified at the hearing that his back problems began as early as 1941, at which time the claimant was approximately 21 years old. Morse, in his petition to this Court, alleged that his disability began as early as 1952, but it seemed that he continued to work until 1954 or 1956.

That he does have a real and serious back condition, in particular an intervertebral disc problem, is well established by several competent medical reports received in evidence at the hearings. In fact, the Court which heard this case prior to remand determined that the claimant did have a "basic disability" with respect to his disc condition. Morse v. Celebrezze, 235 F.Supp. 810 (E.D.La. 1964). But the claimant's testimony at the supplemental hearing as well as at the original hearing contains a strange recitation of diverse and seemingly end-

2. For purposes of simplicity we have throughout this opinion used the term "basic disability" to mean the first fundamental conditions of disability as defined in the Social Security Act itself: that is, "inability to engage in any substantial gainful activity by reason of a medically determinable * * * impairment * * *." "Basic disability" can then be considered refined by the additional requirement, not expressly set forth in the Act, but contained in the regulations and implied by the cases, that the impairment not be remedial with "reasonable effort and safety to the claimant." This semantic dichotomy may aid in a more efficient discussion of the problems herein.

3. Despite the limited scope of the remand made by the Court previously, the hearing examiner on remand apparently

took it upon himself to re-open the whole of petitioner's case in all its aspects, over the objections of petitioner's counsel. The Court having previously accepted the Secretary's finding that the claimant was "basically disabled", that question would seem to have been closed; and the Court in fact remanded the case solely for the limited purpose of further inquiry into the reasonableness or unreasonableness of claimant's refusal to submit to the proposed surgery. Nevertheless, there seems to have been a zealous attempt on the part of the agency to support its denial of benefits to this claimant, for the examiner went far beyond the scope of the purpose of the remand in attempting to establish that, even without the remedial surgery proposed, the claimant would be able to find some "substantial gainful employment." See Record, pages 184–185; 243–248.

less complaints involving not only his back but practically every part of his body. According to Morse's testimony, he suffers from arthritis, glandular trouble, heart trouble, stomach pains, blackouts, dizzy spells, eye trouble; arthritis in his "arms, legs, neck and chest"; and at various times felt that he was "fixing to be paralyzed." Obviously, the causes of this all-encompassing pain are not physical. A simple reading of Morse's testimony will reveal, and this is borne out by the testimony of medical and psychiatric testimony at the supplemental hearing as well as a psychiatric report received at that time, that the petitioner is not a malingerer and that he really does experience the pain which he relates.

██ This Court is deeply impressed with the humanitarian nature of the Social Security Act. Although such general abstract considerations should not be allowed to obscure the unequivocal wording of the statute, or allow recovery to those who, by their wilfull and unreasonable acts, show themselves unworthy to receive the benefits reserved to others honestly in need, nevertheless the humanitarian goal of the statute does demand, among other things, an earnest effort on the part of agency officials to aid claimants, especially the poor, the illiterate and those of low intelligence who are unrepresented by more competent persons, in presenting their cases and to give such claimants every honest consideration. In such cases, as indeed in all others under the Act, the hearing examiners exercise a judicial function, and it is their grave duty, especially consistent with the nature of this legislation, to remain impartial and to refuse to allow personal prejudices and emotions to play any part in their decisions, particularly when those decisions deny benefits under the Act. We have already noted [4] the apparent zeal with which the agency in this case seems to have defended its denial of benefits to this claimant. We do not wish to imply in any way that

this zeal was the result of any individual prejudice rather than a conviction of the correctness of the position, but we do assert that an agency official, simply out of respect for the nature of this Act, should be reluctant rather than zealous to deny benefits where there is any indication that a claimant may be entitled to them.

There is abundant evidence in the record to establish that claimant's back impairment could be remedied by means of a spinal fusion operation, and that this procedure was suggested by several orthopedic surgeons. It is also undisputed that claimant has persistently refused to submit to the suggested operation. In fact, as we have indicated, it was on the basis of his refusal, and the Secretary's finding that this was "unreasonable", that benefits were denied. However, the hearing examiners and the Appeals Council failed to take into consideration two highly relevant factors brought out clearly in the record, and which, when considered in the proper light and with a proper understanding of the law, make a finding of disability the only reasonable conclusion in this case.

IV.

The refinement of the definition of "basic disability" contained originally in the Act to exclude therefrom impairments reasonably remedial has been developed by the courts for the obvious reason that such impairments could not be considered or expected to "be of long continued and indefinite duration" as originally required by the Act. See Bradey v. Ribicoff, 298 F.2d 855 (4th Cir. 1962). As one court stated, "Not until treatment has been tried and found unavailing can it be said that a reasonable certainty of permanence appears." United States v. Hammond, 87 F.2d 226, 227 (5th Cir. 1937). This approach has been embodied in an express administrative regulation, 20 C.F.R. § 404.1502(g), quoted supra. The application of that regulation has carried over under the

4. Supra, n. 3.

amendment to the Act's basic definition of disability which now only requires that the disability impairment be expected to "last for a continuous period of not less than 12 months." Language in some of the cases has centered around the simple question of whether or not a condition was remedial, seemingly de-emphasizing the importance of the corollary question of whether or not the "remedy" could be accomplished with reasonable effort and safety to the claimant. Thus in Ward v. Celebrezze, 311 F.2d 115 (5th Cir. 1963), the court affirmed a Secretary's finding of lack of disability, stating:

"* * * [claimant's] condition is remediable and his ability to work could be substantially improved by surgery. * * * 'Not until treatment has been tried and is found unavailing can it be said that a reasonable certainty of permanence appears. * * *' 'An impairment which is presently capable of being classified as remediable cannot meet the requirement that it be "of long-continued and indefinite duration". We think it plain that the express terms of the Act require a reasonable showing of the permanence of the disability.' Bradey v. Ribicoff, 4th Cir. 1961, 298 F.2d 855." 311 F.2d at 116.

▇▇ Whatever may be the significance of this approach, it seems that as of the present date, especially in view of the recent expression of Congressional intent in connection with the 1965 amendments to the Act, supra, in view of the widespread recognition given 20 C.F.R. § 404.1502(g), and in view of other recent judicial developments, denial of benefits based on a claimant's refusal to submit to cure is only permissible where the cure can be effected "with *reasonable* effort and safety" to the claimant. However, serious questions seem to remain as to the meaning and importance of the word "reasonable" in these matters.

One orthopedic surgeon, whose report appears in the record, diagnosed claimant's back condition as "degenerative intervertebral disc between the fifth lumbar vertebrae and the first sacral segment," (Record—page 103); another found "lumbosacral joint disease of severe degree with marked deterioration of the lumbar disc and evidence of nerve root irritation" (Record–81); another surgeon reported a similar finding: "Advanced degenerative disease of the lumbosacral disc associated with chronic nerve root findings." (R–336)

This condition was well documented in addition by various X-ray reports and by a myelogram performed on the claimant at Charity Hospital in 1956. (R–85) [5]

The remedial treatment suggested to the claimant for this condition was a spinal fusion operation (see the medical reports of Dr. H. R. Soboloff and Dr. Richard M. Levy, R–81 & 103). Dr. Jack Wickstrom, Professor of Orthopedics at Tulane University, who testified at the supplemental hearing, outlined clearly the nature of the operation necessary:

"[The claimant] would require a laminectomy of the 4th interspace between the 4th and 5th lumbar vertebrae and fusion of the lumbarsacral joint. This would probably require fusion extending from the 4th lumbar vertebrae down to the 2nd sacral segment. This would be carried out by placing bone from one of the iliac crest or some other portion of the body across these joints and allowing this to incorporate when it heals into a solid mass." (R–227)

▇▇ The claimant persistently refused to undergo this operation. The

---

5. It is indicative of the approach of the hearing examiner that, although claimant had previously submitted to that myelogram, (an extremely painful procedure), which brought positive and unmistakable results, the examiner requested claimant to submit to another, and held the claimant's refusal to undergo this painful process a second time as a significant factor against his recovery of benefits. See Record—162.

Secretary found that the operation was a "safe, available procedure," (R–9), and that claimant's refusal to submit to the operation was "unreasonable." In support of this position the Appeals Council opinion contained the following statement:

"A substantial weight of authority has denied benefits to claimants where spinal fusion or spinal laminectomy is indicated by qualified medical opinion. Spinal fusion: Copelin v. Ribicoff, 194 F.Supp. 953 (W.D.No.1961); Sheppard v. Flemming, CCH supra, para. 8996 (E.D.S.C.1960) [Prentice-Hall, Social Security, ¶ 32,589.2]; Massee v. Celebreeze, CCH, supra. para. 15,059 (M.D.Ga. Macon Division 1963) [Prentice-Hall, supra, ¶ 36,951.15]. Spine Operation: Jarvis v. Ribicoff, CCH supra, para. 14,264 (E.D.Ky.1962) [202 F.Supp. 796]. Laminectomy or fusion of lumbosacral joint: Seeman v. Flemming, CCH supra, para. 9119 (S.D.N.Y.1961) [Prentice-Hall, supra, ¶ 32,589.2]. The refusal of this claimant to accept the remedy offered by qualified physicians for a condition which he asserts is disabling must preclude him from benefits under the Act." (R–9) (additional citations supplied)

Merely because a remedy is "offered by qualified physicians" does not automatically make a claimant's refusal to submit to the treatment unreasonable. Of the five cases cited by the Appeals Council in the passage quoted, three are unreported except for short and incomplete summaries in the services referred to; one case, Jarvis v. Ribicoff, 202 F.Supp. 796 (E.D.Ky.1962), was reversed on appeal, 312 F.2d 707 (6th Cir.1963), the Court of Appeals stating:

"What kind of surgical operation, entailing what danger to life, must an applicant undergo, at the behest of a surgeon who does not suggest the possibilities of cure or remedy?" 312 F. 2d at 711.

In the remaining case, the district court issued what might be termed a "per curiam" opinion, affirming the Secretary's decision and defining the nature of the claimant's injury as a "ruptured disc" and stated simply:

"The hearing examiner found that plaintiff had refused recommended treatment or surgery which in the opinion of examining physicians could have diminished the impairment with reasonable effort and safety to himself." Copelin v. Ribicoff, 194 F.Supp. 953, 954 (W.D.Miss.1961).

At the first hearing of this matter before the Secretary, a ruling was made (on insufficient evidence, according to the judge of this Court who remanded the case on its first appearance here) that the claimant's refusal to accept the remedy offered was unreasonable. At the supplemental hearing, at which the sole question was to be an inquiry into the factors which might relate to the finding of unreasonable refusal,[6] the only evidence of any bearing whatsoever to the point was the testimony of Dr. Jack Wickstrom concerning the precise nature of the surgery required[7], the risks involved and the chances of success. Wickstrom stated that:

"We have a 70% chance, about 65 to 70% chance of decreasing his organic pathology in his low back so that he could participate in gainful employment." (R–231)

Wickstrom had this to say about the risks involved in the suggested operation:

"There is risk of fatality as in any surgery. I cannot tell you the statistically accurate rate of fatality associated with spinal fusions.

"Q: Is there risk of increasing disability?

"A: There is a slight risk of increased disability.

\*  \*  \*  \*  \*  \*

---

6. Supra, n. 3.

7. The substance of that testimony is quoted supra at page 10.

"Q: In considering the possibility of genuine fear of claimant to have surgery performed, what is your testimony as to possible success or failure of the surgery you just described?

"A: I don't feel fear would affect the success. I know of no evidence that fear would impair or enhance the success of the procedure. I'd like to blame some of my fatalities on fear."

(Record—pages 227, 228)

Wickstrom, as well as Dr. Charles Watkins who also testified at the supplemental hearing, went far beyond the relation of objective factors and constantly reiterated, at the urging of the examiner, their own personal opinions of the reasonableness of claimant's refusal of surgery. At one point Dr. Wickstrom stated:

"I do not believe it [that is, the claimant's refusal to accept the surgery offered] is reasonable * * *. If a man has something wrong with him and has a chance of cure offered, it should be accepted, and stating that no doctor would guarantee this,—we might point out the only thing that can be guaranteed are death and taxes, and taxes take precedence over death, as attorneys well know, and no one can guarantee anything for this man, medically or otherwise, and this is an unreasonable attitude, I think. At least if everybody held this * * * I would have to go out of business." (R–229, 230)

Dr. Watkins, Professor of Psychiatry at the LSU School of Medicine, testified as follows:

"Q: You do not think it would be reasonable for a man to refuse surgery based on fear?

"A: No, sir."

8. The only two doctors who ventured to give opinions at all as to the unreasonableness of petitioner's refusal were Wickstrom and Watkins. The orthopedic surgeons who actually examined claimant and offered the remedy of a spinal fusion

(R–216)

It seems to this Court that whether or not an impairment can be remedied "with reasonable effort and safety" to a claimant is a conclusion of law to be drawn by the Secretary, or by this Court if it becomes necessary, and not a fact to be elicited as such from medical testimony, no matter how medically expert the witness may be. The testimony of Wickstrom and Watkins as to the reasonableness of claimant's attitude, and statements similar thereto, obviously have no bearing on this issue.

▮ The determination of whether or not this claimant's refusal to accept the surgery described was "reasonable" seems to this Court analogous to the determination to be made in automobile negligence suits as to whether or not a defendant or a plaintiff acted "reasonably" in the circumstances. The latter finding is not something to be testified to by even the most expert driver on the Grand Prix circuit, but must be made by the fact-finder in each case. In the present case, the doctors' opinions [8] as to the reasonableness of claimant's refusal are not facts, or even expert opinions, but bald conclusions of law which they were not competent to make. See United States Coal & Coke Co. v. Lloyd, 305 Ky. 105, 106, 203 S.W.2d 47 (1947); Edwards v. Trav. Insurance Co., 202 Tenn. 364, 372, 304 S.W.2d 489, 492 (1957).

An operation such as that outlined by Dr. Wickstrom as the remedy for claimant's condition is quite a serious procedure. One medical expert has written that spinal fusions

"usually do not heal well, and this is why we hesitate to do one unless it is really indicated. If they don't heal, we call this * * * a false joint. If you put a bone graft across an area [which is exactly what a spinal fusion entails], a false joint may occur

offered no opinions in their reports as to the reasonableness of claimant's refusal to accept the operation or, for that matter, the chances of success or risks of failure involved.

which can be extremely painful. Unfortunately, this is something that occurs in all clinics, no matter who does the operation; it occurs in anywhere from ten to fifty percent of the cases." The Back: A Law-Medicine Problem, page 248 (The W. H. Anderson Co., 2nd Edition 1965).

A United States Court of Appeals has stated outright:

"It is common knowledge that spinal fusion operations are often dangerous and entail much pain and suffering." Ratliff v. Celebrezze, 338 F.2d 978, 11 A.L.R.3d 1124 (6th Cir. 1964).

In the *Ratliff* case, the Court reversed the Secretary's denial of benefits, stating:

"[The] appellant's refusal to submit to a spinal fusion operation, especially when the surgeon advising such operation considered the attitude of the patient a reasonable one, cannot be held to be a refusal to cooperate in remedial treatment." 338 F.2d at 981.

This Court holds that a physician's opinion as to the unreasonableness of a claimant's refusal to submit to a spinal fusion operation, although it may carry some weight with the fact-finder, cannot alone support a finding of unreasonable refusal in the absence of supporting documentary evidence greatly mitigating the serious nature of the operation.

One court has stated, in connection with a claimant's refusal of a spinal fusion operation, that:

"There are some who will not undergo major operations. Others will undergo major operations only as a last resort to prevent death. The Social Security Act is humanitarian legislation and we do not believe that it requires a sincere person who has a great fear to submit to an operation in an effort to diminish his impairment in order to have a disability period established." Martin v. Ribicoff, 195 F.Supp. 761, 772 (E.D.Tenn.1961). See also Wiley v. Celebrezze, 244 F.Supp. 504 (W.D.Mich.1965); Henninger v. Celebrezze, 349 F.2d 808 (6th Cir. 1965).

This Court agrees wholeheartedly with that approach.

Appropriating again the analogy of the "reasonable man" criteria in negligence cases, it might be noted that a refusal to act may be reasonable, even though the probability of danger in acting is very slight. For example, a "reasonable man" might refuse to cross an interstate highway blindfolded even at 3:00 a. m. in the morning when the chances of his being hit by a passing automobile are merely two or three thousand to one. Cf. Prossor on Torts, page 122 (2nd Edition). A "reasonable man" might refuse to do that even if he had other very good reasons for crossing the road under those conditions. So, in this present situation, a claimant might be quite reasonable in refusing an operation in which, even conceding the probabilities of risk to be small, there is a real possibility of great danger.

We do not consider the opinion in Ward v. Celebrezze, 311 F.2d 115 (5th Cir. 1962), controlling, by reason of the absence therein of particular facts and circumstances by which that case might be compared to the present situation. The claimant in the *Ward* case had had a ruptured disc removed without relief of his pain. The Court did not explain the cause of the continued pain or the nature of the surgery required to relieve it. Moreover, as we have indicated previously, the Court in *Ward* did not explore the requirement that refusal be unreasonable to support denial of benefits.

In view of the foregoing, and especially in view of the fact that this matter was remanded to the Secretary for the sole purpose of obtaining evidence related to the chances of success and the risks involved in the proposed operation and that there were no facts elicited at the supplemental hearing mitigating the dangers in what we must only presume to be a serious operative procedure other than statements of the personal opinions of two witnesses as to the reasonableness of the claimant's refusal, we are compelled to reverse the Secretary's find-

ing that claimant's refusal of the surgery was "unreasonable".

█ The foregoing considerations would, of course, be irrelevant in the case of a claimant who, despite the seriousness of the operation, does not in fact fear it. We do not reject the idea that the determination of reasonable or unreasonable refusal is an objective one.[9] What we do say is this: Objectively speaking, it is reasonable for one suffering from a disabling and perhaps painful impairment to refuse to undergo treatment for that impairment where such treatment consists of the major and potentially dangerous surgery required here; it would not only be unreasonable, but contrary to the humanitarian spirit of the Act, not to make allowances for the fears of individuals in such situations. Cf. Whittier v. Gardner, 263 F.Supp. 670, 675 (S.D.Maine 1967) and cases there cited. However, where the determination is made that a particular claimant in fact does not fear the operative procedure involved, his mere refusal to submit to surgery then would have to be considered unreasonable if based solely on a desire to continue receiving Social Security benefits or some other frivolous reason.

The report of the hearing examiner at the supplemental hearing might be read as implying that the examiner's finding was that in fact the present claimant did not fear the proposed operation. His report states:

"The facts in the instant case show that claimant was offered spinal surgery in 1956, by the Charity Hospital, and he refused, saying: 'he's not interested in surgical relief, has no faith in it, doesn't want it and never will.' At the first hearing in December 1962, he testified that he would be operated on 'tomorrow' if someone would 'promise' him or 'guarantee' that a 'cure' would be effected. While at the supplemental hearing in May 1965, he testified that he refused surgery because of 'fear'." (R–168)

This Court finds completely unsupported in the record the examiner's impression that this claimant at the first hearing evidenced a lack of fear of the proposed operation. It is true that at the supplemental hearing the claimant testified in express terms that he had refused the surgery because of "fear" and used the word "fear" repeatedly. It is quite possible that the claimant became acquainted with the word "fear" between the date of the first hearing and the date of the second, for he seems not to have used the word at the first and to have used it quite readily at the second hearing. This Court, however, attaches no magical significance to that word. It must be remembered that this claimant was illiterate, had only a third grade education, and his intelligence was placed by one psychiatrist who examined him "within the dull normal or mildly retarded range." (R–334) The District Judge who first considered this case, prior to remanding it, made special note of claimant's fear. The Court stated:

"* * * testimony elicited from plaintiff at the hearing indicated that he was extremely fearful of having back surgery performed. At one point he responded regarding a recommendation that surgery be performed:

'I asked the doctor would that be a cure, and he said he couldn't promise. Any doctor can't promise me

---

9. Although it has been said that whether or not a medically determinable impairment (itself an objective finding) actually "disables" a particular individual is a subjective determination, to be made on the basis of the state of mind and the capabilities of each individual claimant. See Whittier v. Gardner, 263 F. Supp. 670, 675 (S.D.Me.1967). However, the further inquiry into the possibility of remedying the impairment would seem to be a strictly objective one since the wording of the regulation is: "with *reasonable* effort and safety to the claimant."

It may be noted that where reference is made to "reasonable" or "unreasonable" refusal, the real consideration determining the reasonableness of the refusal to submit to a possible remedy is whether or not the remedy can be tried "with reasonable effort and safety to the claimant."

something on an operation I don't want him to experiment with my back.'

"Shortly thereafter he commented further on his refusal to permit surgery:

'If they wouldn't have talked two ways I would have. He (Dr. Soboloff) told me he didn't think it would do me no good, well, I ain't going to be cut on by thinks. He should have knowed.'

"This graphically indicates that plaintiff harbored at least a reasonable fear for his personal safety in contemplation of the suggested back surgery." 235 F.Supp. 810, 812 (E.D.La.1964).

■ We find the record of the first hearing replete with evidence that the claimant did in fact have a real fear of the suggested surgery and we find whatever conclusion the hearing examiner at the second hearing may have made to the contrary completely unsupported by the evidence.

### V.

A second situation apparently dismissed as irrelevant by the Secretary is also quite important to the question of disability and in fact also requires a reversal of the Secretary's finding.

We have already noted the strange and bizzare symptoms of pain which this claimant apparently experienced all over his body. The Appeals Council decision on remand stated:

"As counsel contends, there is medical opinion to the effect that, no matter how successful this surgery may be from an organic viewpoint, it is unlikely that there will be any change in the claimant's unusual and bizzare complaints of pain from the top of his head to the tip of his toes, including his ears, and also that there is little likelihood of the claimant returning to work unless his personality difficulties were also corrected. However, suppositions as to how the claimant would feel and as to what he would do after surgery are purely academic." (R–123)

The Appeals Council obviously overlooked the fact that the claimant's personality disorder might not only preclude his returning to work after the correction of his physical back impairment, but also may well be a significant factor causing, or multiplying the effects of, claimant's fear of the suggested surgery.

■ Moreover, assuming for purposes of argument that claimant in fact experienced no reasonable fear of the proposed spinal fusion, and that the operation could be performed "with reasonable effort and safety" to the claimant, and that the only basis for his refusal was the anxiety mechanisms associated with his demonstrated severe personality disorder—still the question of claimant's "basic disability" due to his personality disorder would not be "purely academic", but directly and immediately relevant. In effect, the claimant's back impairment would then have to be considered "remedial" and the only thing standing between him and a cure would remain the mental, or personality disorder. This Court cannot hold that a claimant with two impairments, both cognizable as "disabilities" under the Act, is compelled to correct a remedial one before he can collect under the non-remedial impairment.

The Secretary's decision was apparently grounded basically—and this impression is borne out quite vividly by the collective effect of all of the reports of the two hearing examiners and the three opinions of the Appeals Council—on the agency's position that a claimant with a "mere" personality disorder, no matter how serious and uncontrollable, simply cannot collect disability benefits under the Act. That position, quite obviously to this Court, led the agency to dismiss from consideration the claimant's fear of surgery, and the serious nature of the surgery, probably on the belief that the more basic cause of claimant's refusal to submit to the treatment was actually his personality problem. That position now leads to the agency's contention that this claimant, before he is even to be al-

lowed to argue his personality disorder as a disability impairment, must first submit to treatment for his back.

The Secretary did in fact definitively find that the claimant experienced a real and significant personality problem. The nature of that problem is strikingly revealed by the record of claimant's testimony at the original hearing wherein he recounted the many ailments we have already mentioned. In addition, Morse stated that he did nothing but remain in bed most of the day, that he did nothing to support his wife or help her with any of the household chores, that in fact he was fully supported and cared for by his wife.

, Dr. Jacob Weisler, to whom the claimant was sent for psychiatric evaluation by the Secretary on remand, described claimant's condition as follows:

> " * * * Mr. Morse's refusal to submit to the suggested operation on his back is representative of his severe passive-aggressive type of personality disorder * * *. I do not believe that surgery would modify his severe personality disorder or his attitude regarding his ability to work." (R–335)

The two doctors who testified at the supplemental hearing, Drs. Wickstrom and Watkins, after thorough reading of the psychiatric reports, considered claimant's personality disorder quite severe. Wickstrom stated that, in his opinion, claimant's pain not only in his back but throughout his body was "real to him." Dr. Watkins stated, "From the record and from the testimony given this morning, I certainly would not see anything where a diagnosis of malingering could be made." (R–219)

The opinion of the Appeals Council states:

> "In the circumstances, the Appeals Council agrees with the opinions of the doctors who say that it is unlikely that surgery will change the claimant's attitude toward his ability to work. This attitude results from a life-long personality disorder * * *." (R–129)

However, the Appeals Council ended this statement,

> " * * * and is not due to psychiatric illness or any other medically determinable impairment."

Here we confront probably the real crux of this case. Is this claimant's personality disorder, as revealed throughout the record and specifically acknowledged by the Appeals Council, to be considered as a "medically determinable impairment" under the Act? We hold that it is.

■ It is the law that a claimant who in fact experiences great and "disabling" pain is entitled to disability benefits even though the pain is not caused or accompanied by any demonstratable organic defect. Jones v. Celebreeze, 246 F.Supp. 701 (D.Kan. 1965); Page v. Celebreeze, 311 F.2d 757 (5th Cir. 1963). Merely because the existence of pain or its causes cannot be determined by the clinical techniques of the laboratory does not mean that such pain is not "medically determinable" under the Act. Page v. Celebreeze, supra. There is adequate evidentiary basis in this record that this claimant did in fact experience the "strange and bizarre" symptoms of pain he described; in fact, there is nothing in the record to indicate otherwise. Merely because that pain was caused by a "personality disorder" rather than a "psychiatric illness" or "psychosis" is no reason, in the opinion of this Court, to discount or dismiss the fact of the pain. See Englander v. Flemming, 186 F.Supp. 773, 775–776 (S.D. N.Y.1960).

■ This claimant's disorder is that of a "totally dependent personality" accompanied by feelings of inadequacy and involving probably a subconscious attempt to maintain his disability. He is not a malingerer, however. His "flight from responsibility", not a desire to defraud the government, is the compulsion which drives him to diverse pain experiences, contributes to his fear of the remedial surgery suggested to him, and relegates him to the role of a totally helpless individual. These are all fair inferences from the record and represent the

opinions of the Appeals Council and the hearing examiners. We hold this condition to be a "medically determinable" impairment. We cannot see any good reason to distinguish this impairment from others of an uncontrollable psychological nature merely because the disorder involved is directly related to escape from responsibility or "employment", if in fact, as the evidence indicates, the claimant's personality disorder is real and severe.

Whether or not the claimant's psychological problems could be affected by psychiatric treatment was not considered by the Secretary. However, in view of our reversal of the Secretary's decision on other grounds, supra, we decline to remand this matter for a third agency hearing.

The motion of the plaintiff for summary judgment is accordingly granted, and the cross-motion of the defendant for similar relief is denied. The final decision of the Appeals Council is reversed and the 'Secretary is ordered to award the appropriate disability benefits to the plaintiff.