Columbus RATLIFF, Plaintiff-Appellant,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 15410.

United States Court of Appeals
Sixth Circuit.

Dec. 8, 1964.

Dan Jack Combs and Ronald W. May, Pikeville, Ky., for appellant.

John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Terence N. Doyle, Attorneys, Department of Justice, Wash-

ington, D. C., Bernard T. Moynahan, U. S. Atty., Lexington, Ky., for appellee.

Before O'SULLIVAN and PHILLIPS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Appellant's claim for disability benefits under the Social Security Act, Title 42 U.S.C.A. § 405(g), was denied by the Hearing Examiner and, after consideration by the Appeals Council, the Secretary of the Department of Health, Education and Welfare adopted the Hearing Examiner's finding. The District Court affirmed the decision of the Secretary.

On December 23, 1957, appellant, a coal miner, suffered injuries to his back and chest in a slate fall while working in a coal mine, and he was taken to the Miners Memorial Hospital at Williamson, West Virginia, for examination, where he remained for about three weeks. He was there treated by Dr. Fred Bedford, who diagnosed his injuries as fractures of the transverse processes of the lumbar vertebrae on the right side, with lateral displacement approximately two to three centimeters away from normal position, rotational displacement of the lower lumbar spine, possible anterior displacement of L–5 vertebrae, and fractures of the ninth and tenth ribs on the right side. Further examination of appellant revealed that he had a running ear on the right with deafness, poor vision, and arthritis of the back and legs. A plaster of Paris cast was applied to appellant's trunk and right lower extremity of his body. He was subsequently released from the hospital with instructions to return to the Orthopedic Clinic about four weeks following his discharge.

Appellant returned to the hospital on February 25, 1958, and was readmitted for a period of one week. During this time he was examined and treated by Dr. A. A. Grebe. Dr. Grebe removed the plaster of Paris cast from appellant's body and determined that healing was progressing in a satisfactory manner, but had not yet been completed; and the plaster of Paris cast was reapplied. Dr. Grebe's diagnosis of appellant was fracture of the transverse processes of the lumbar vertebrae on the right side, L–1 through L–5, and spondylolisthesis.

On August 12, 1958, appellant returned for a scheduled appointment with Dr. Grebe at the Orthopedic Clinic of the Miners Memorial Hospital, at which time he complained of pain in the lower part of the back which he reported was aggravated by activity. At this time the plaster of Paris cast had been removed and appellant had been furnished with a lumbosacral support which he had been using and which he said gave him some relief, but not enough to permit him to return to his usual occupation as a miner. Dr. Grebe was of the opinion that appellant's symptomatology was largely due to the unstabled lumbosacral joint and suggested that a lumbosacral fusion might be of benefit to him; but appellant objected to the idea of surgery, and Dr. Grebe felt that appellant's attitude was reasonable, in view of the fact that Dr. Grebe could not be absolutely certain that the operation would rehabilitate appellant to the point where he could resume his usual activity in the mines. Dr. Grebe stated he did not think that surgical intervention should be urged upon appellant.

On February 23, 1959, appellant was examined by Dr. Kearns R. Thompson of Lexington, Kentucky. At this time, appellant complained of pain in his back, stating that his back hurt continuously and that he could hardly turn over in his bed. Dr. Thompson performed comprehensive medical tests and examinations of the appellant, including X rays. A lumbosacral series of X rays were made which revealed a slight scoliosis of the lumbar spine to the left, secondary to asymmetry which appeared to be due to an extra bony mass between L–5 and S–1 on the right, and which seemed to deviate the spine on the left. There were also evident un-united fractures of the transverse processes of L–2, L–3, and L–4. In the lateral view there was a good lumbar lordosis. There was forward displacement of L–5 on the sacrum by

approximately three-eighths of an inch. The spinous processes showed no evidence of fracture. Other evidences of injury are unnecessary to mention. Dr. Thompson's diagnoses were fracture, transverse processes, L-2, L-3, and L-4, right; spondylolisthesis; and hemivertebra, right. Dr. Thompson remarked that it was difficult to ascertain from the current X rays which he had made of appellant, whether his spondylolisthesis originated at the time of the injury, and he therefore requested an opportunity to examine earlier X rays which had been made of appellant. On March 5, 1959, Dr. Thompson received the original X rays, and reported that they "reveal that this patient has only four functioning lumbar vertebrae." Moreover, the original X rays revealed fractures of the transverse processes of L-1, L-2, L-3, and L-4 on the right, and L-4 and L-3 on the left; a definite fracture of the posterior element, consisting of the lamina of L-4; and that the fourth lumbar vertebra showed an obliquity with unusual bony prominence on the right between the lateral mass of L-4 and the sacrum. Further, the lateral films of March 5, 1959, showed definite forward displacement of the last lumbar vertebra on the sacrum.

On April 8, 1959, appellant reported to the Department of Health, Education and Welfare that he was unable to bend over or lift anything; that he was required to rest about every hour or so; and that he could not stand on his feet for any duration of time. He reported that he had received a vacation check from his employer in 1958, but that this was income that was earned in 1957, and that he had not been working at any time since the date of his injury on December 23, 1957. At the same time, appellant furnished the Department of Health, Education and Welfare with a letter which he had received from the Miners Memorial Hospital, advising him that he was not entitled to medical services from the U.M.W.A. and Retirement Fund, and that if he desired a lumbosacral fusion performed, the cost would be approximately $1,500. Appellant stated that he did not have the money to pay for this operation.

On the same date, April 8, 1959, appellant filed application for a period of disability and/or disability insurance benefits with the Department of Health, Education and Welfare; and he was subsequently referred to Dr. A. A. Grebe of the Miners Memorial Hospital for further examination. Appellant was given comprehensive tests and examinations and, while most of the objective tests were negative, the X-ray studies did substantiate appellant's subjective complaints. X-ray studies of the lumbosacral spine were made and indicated that there were un-united fractures of the spinous processes on the right side of L-2, L-3, L-4, and L-5. There was approximately fifty per cent displacement at the lumbosacral junction, and there was some narrowing of the lumbosacral joint. Dr. Grebe observed that appellant was still wearing the lumbosacral support which had been furnished him some three years before, and further stated that he believed appellant did have a definite organic basis for his low back pain in the spondylolisthesis.

The important result of the X-ray examination of appellant's spine was the disclosure that there were un-united fractures of the spine on the right side of L-2, L-3, L-4, and L-5; that there was a fifty per cent displacement of the lumbosacral junction, and narrowing of the lumbosacral joint, and that there was a definite organic basis for appellant's low back pain. On March 5, 1959, Dr. Thompson submitted a report to the Claims Manager of the Underwriters Safety and Claims of the Government. In this report, Dr. Thompson, after observing that claimant had only four functioning lumbar vertebrae, stated, according to the decision of the Hearing Examiner, that claimant could not work because of his back pain, and he suggested surgical repair by means of a spinal fusion. Previously, as stated, Dr. Grebe had suggested such a spinal fusion, which appellant objected to, and, as here-

tofore mentioned, Dr. Grebe was of the view that surgical intervention should not be urged on appellant, in view of the doctor's conclusion that he could not be absolutely certain that the operation would rehabilitate him to the point that he might resume his usual activities in the mines. In short, Dr. Grebe felt that appellant's attitude as to the operation was reasonable. The evidence was also to the effect that the operation and the attendant hospital care would cost approximately $1,500 out of the pocket of this poor man, who stated that he did not have the money to pay for the operation. It is common knowledge that spinal-fusion operations are often dangerous and entail much pain and suffering. What kind of surgical operation entailing what danger to life, and pain, must an applicant undergo at the behest of a surgeon who does not suggest any certainty of cure or remedy? See Jarvis v. Ribicoff, 312 F.2d 707 (C.A.6).

The Government relies upon Title 20, C.F.R. 404.1502(g) of the social security regulations, which provides:

"An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

It is claimed that appellant's injury was remediable and that because he refused remedial treatment, he is not entitled to disability benefits. Here it is to be again emphasized that Dr. Grebe stated that in his best judgment, claimant's symptomatology was largely due to the unstable lumbosacral joint—it was displaced fifty per cent; and, in spite of his suggestion that appellant might be benefited by a lumbosacral fusion, Dr. Grebe felt that appellant's objection to such an operation was reasonable.

In Martin v. Ribicoff, 195 F.Supp. 761, 772, claimant wage earner had sustained an injury to the lumbosacral spine in the area of L-4 and L-5. Some of the physicians who submitted medical reports in that case were of the opinion that claimant's impairment could be remedied by lumbosacral surgery, and recommended that he submit himself to a lumbar laminectomy, which claimant refused to do because of fear. In discussing claimant's refusal, the court said:

"Plaintiff's position in the matter may be different from the majority of patients in like situations, but this Court believes that there is a sizeable minority that holds to a like view. There are some who will not undergo major operations. Others will undergo major operations only as a last resort to prevent death.

"The Social Security Act is humanitarian legislation and *we do not believe that it requires a sincere person who has great fear to submit to an operation in an effort to diminish his impairment in order to have a disability period established.*" (Emphasis supplied.)

We are of the view that appellant's refusal to submit to a spinal-fusion operation, especially when the surgeon advising such operation considered the attitude of the patient a reasonable one, cannot be held to be a refusal to cooperate in remedial treatment.

The Government also relies upon the fact that Dr. Grebe, after recommending a lumbosacral fusion, nevertheless, gave appellant a release for work in the mines, "which does not require a great deal of bending or heavy lifting," and stated that "For rating purposes at this time, I believe that he has a permanent partial disability as a result of his accident of approximately 25%." This work release and rating of 25% permanent partial disability seems, without more evidence on the subject, a somewhat inadequate conclusion, and it was so qualified that it can be said to offer no suggestion as to what actual work of a substantial gainful nature appellant, a coal miner, in his disabled condition, could actually perform. The work release and rating of 25% permanent partial disability obviously does

not mean a work release for work in the mines, such as appellant had formerly performed. If appellant could not work in the mines, he obviously suffered a 100% disability as far as his former work was concerned.

Appellant was a hard-working miner all his life. What miner can work without a great deal of bending or lifting? That was what appellant had always done. Anyone knows that bending or lifting is necessary in all manual labor, and especially in working in mines. Dr. Hodges stated that appellant could do "upright work—no bending or lifting."

█ When appellant was first admitted to the hospital, Dr. Fred Bedford noted that, among other symptoms, he had "diffuse tenderness over right flank of the lower rib cage down to iliac crest," tenderness in the abdomen, mild swelling of the medial right malleolus, some tenderness over right upper thigh, and that his impression was that appellant had fractures of the transverse process of the lumbar vertebrae, L–1 and L–5, fracture of ribs, No. 9 and 10 on the right, and multiple soft tissue contusions of the right flank. Dr. Bedford's impressions as to the fractures were ultimately borne out by X rays. In his physical examination of appellant, Dr. Bedford also noted: "Patient appears in acute pain, mostly right lower chest." He also mentioned that the patient was alert and cooperative. Dr. Thompson also stressed the fact that, during his medical examination of appellant, he was alert and cooperative. We do not know what kind of work Dr. Grebe had in mind for appellant when he gave him a work release for work not requiring a great deal of bending or heavy lifting, or a 25% rating of permanent partial disability. These cases often reveal an inadequacy as far as medical evidence is concerned, and many of the proofs are unsatisfactory, since they consist of unsworn written statements by physicians and surgeons with no opportunity given to a claimant to ask questions or to cross-examine. The general practice that seems to be followed is that when a man applies for disability benefits, he is given blanks by government representatives to be filled out by the physicians and surgeons, or that the physicians and surgeons fill out such blanks for government insurance authorities, and the Department of Health, Education and Welfare.

"If a wage earner has the inability to engage in 'any substantial gainful work' which is commensurate with his education, training, experience, and physical and mental capacities, then he should be given the benefit of the 'disability freeze.'" Aaron v. Fleming, D.C.M.D. Ala., E.D. 1958, 168 F.Supp. 291, 295. "The words 'any substantial gainful activity' must be read in the light of what is reasonably possible and not what is conceivable. Hodgson v. Celebrezze, [312 F.2d 260]. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available. Roberson v. Ribicoff, 299 F.2d 761, 763 (6 Cir. 1962)." Janek v. Celebrezze, 336 F.2d 828, 833 (C.A.3). Claimant "was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their availability to him as an actual opportunity for employment." Butler v. Flemming, 288 F.2d 591, 595 (C.A.5).

"Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act. If there was any work which this Claimant was able to perform, the record fails to disclose it." Butler v. Flemming, supra, p. 595.

■ Satisfaction of the claimant's statutory obligation to show that he is not able to do any substantial gainful work is to be judged in a practical way. Kerner v. Flemming, 283 F.2d 916, 921, 922 (C.A.2). "Considering the background, experience, training, education, physical and mental capabilities of the Claimant, the kinds and types of employment formerly followed and no longer open to him, the absence of any indication of any specific work less exacting within his residual competency and reasonably available as a prospective source of employment in the general area where he lives," we are of the view that claimant has satisfied the obligation placed upon him by the statute. Butler v. Flemming, supra, 288 F.2d p. 595.

The Hearing Examiner, in his decision, stated that the *"claimant does suffer considerable pain upon exertion,* but the degree of pain elicited is out of proportion with the physical and anatomical findings." There is no proof in the evidence that "the degree of pain elicited is out of proportion with the physical and anatomical findings." The Hearing Examiner also held that the "more thorough physical examinations of this claimant, i. e., those replete with clinical and laboratory findings, do not show that this claimant is precluded from engaging in some substantial gainful activity. This is stated by Dr. A. A. Grebe and Dr. Francis H. Hodges." There is no evidence in this case that Dr. Grebe or Dr. Hodges ever stated that the clinical and laboratory findings did not show that appellant was precluded from engaging in some substantial gainful activity.

In Ellerman v. Flemming, 188 F.Supp. 521, 527 (D.C.), the court said:

"Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. *If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently.* \* \* \* *Here, the Referee has made no such finding, whatsoever, based on evidence."* (Emphasis supplied.)

■ It is undisputed that claimant offered evidence of his inability to do the kind of work in the mines he had previously performed—that is, manual labor as a coal miner. The burden of proof, in accordance with the rule announced in the foregoing case, was upon the Secretary to adduce some evidence from which a finding could be made that appellant could do other work of a substantial gainful nature—actually, not apparently.

In Williams v. Celebrezze, 228 F.Supp. 627, 630 (D.C.Ky.), the court said:

"The testimony of the above physicians seems amply sufficient to show plaintiff's inability to carry on any longer the work in which he was engaged for most of his adult life. Under such circumstances and conditions, contrary to the views expressed by the Hearing Examiner but according to the authorities hereinafter set out, the law places the burden upon the defendant to show that plaintiff was able to perform some kind of substantial gainful activity which was available to him; and, upon the failure of the defendant to produce evidence upon which appropriate findings in that respect could be made, plaintiff is entitled to prevail on his proofs. Rice v. Celebrezze, 6 Cir., 315 F.2d 7, 17.

"The Hearing Examiner made no findings on the issues as to what the plaintiff can do or what employment opportunities are available to a person afflicted as he was, and no evidence to sustain such findings was

presented by the defendant. The rule is now thoroughly established by the Court of Appeals of this circuit that without such findings the decision of the Secretary cannot be supported. King v. Flemming, 6 Cir., 289 F.2d 808; Roberson v. Ribicoff, 6 Cir., 299 F.2d 761; Holbrook v. Ribicoff, 6 Cir., 305 F.2d 933; Jarvis v. Ribicoff, supra; Hall v. Celebrezze, 6 Cir., 314 F.2d 686; Jones v. Celebrezze, 6 Cir., 321 F.2d 192."

It is mentioned in the government's brief that appellant was given the opportunity to learn the barbering trade in order to rehabilitate himself, and, to this end, appellant left his home in Biggs, Kentucky, and went to Richmond, Virginia, to attend a school for barbers located in that city. "After several months", he was put out of that school, as the Counselor of the Bureau of Rehabilitation Service of the State of Kentucky said, because "he has continued drinking, and moved from time to time because of this drinking * * * and his conduct continued to be poor regardless of warnings and protest." Appellant thereafter asked that the barbering tools be sent to Mr. Bigley at Grundy, Virginia, where he hoped to earn as he learned; but the barbering school shortly afterward received a letter from appellant stating he was unable to return to work. He wanted the tools sent to his home in Kentucky, but that was not done, because, in the latter state, a barber could not be licensed unless he had educational qualifications which appellant did not possess. When appellant made his application to establish disability on March 8, 1959, he stated that his back pained so badly that he could not stand on his feet for any duration of time. With regard to this point, Dr. Grebe, on August 14, 1961, reported that appellant complained of low back pain, which he said was "aggravated by activity, such as walking, prolonged standing, and working." Dr. Grebe, at this time, thought there was a definite organic basis for his low back pain in the spondylolisthesis, which would not be disabling, except possibly for work which required excessive bending, lifting, stooping, or prolonged walking. The disability determination of the Department of Health, Education and Welfare, dated September 7, 1961, stated: "Medical evidence dated 4/20/61 gives a diagnosis of ankylosis of lumbar spine due to injury and deafness in right ear. Patient has pain in lower back and unable to stand more than an hour." The foregoing sustains appellant's claim of inability to stand for more than an hour while barbering. It is to be observed that the Hearing Examiner attached no importance to the question of the inability of appellant to pursue the trade of barbering as a rehabilitation measure, or of his alleged drinking, inasmuch as no mention was made of these matters in the extensive eleven-page decision of the Hearing Examiner. Nor do we, in view of the circumstances heretofore mentioned, deem these matters controlling or of importance.

■ It is our view that appellant proved his disability to carry on work of a substantial gainful nature subsequent to his injury in the coal mine; and, furthermore, the Secretary has not carried the burden of proof of showing that appellant was able to perform some kind of substantial gainful activity.

In accordance with the foregoing, the judgment of the District Court is reversed, and the case is remanded with instructions to allow disability benefits to the appellant.