**James E. COOPER, Plaintiff,**

v.

**Elliott L. RICHARDSON, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 1282.**

United States District Court,
S. D. West Virginia,
Bluefield Division.

Oct. 30, 1971.

Michael C. Smith, Union, W. Va., for plaintiff.

W. Warren Upton, U. S. Atty., Charleston, W. Va., Leo J. Meisel, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. A decision by a hearing examiner on February 2, 1971, became the final decision of the Secretary when the Appeals Council denied plaintiff's request for review on April 20, 1971. This final decision holds that plaintiff is not entitled to a period of disability or disability insurance benefits under the provisions of the Act.[1]

Plaintiff meets the special insured status requirements of the Act through September 30, 1973, however, for favorable consideration to be given on this application which was filed March 11, 1970, he must establish that disability began prior to April 20, 1971, the date the Secretary's decision became final. 42 U.S.C.A. § 423(b) and § 416 (i) (2) (G). The burden is upon the plaintiff to demonstrate with credible evidence that he was disabled within the meaning of the Act, though such proof need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

The standard of judicial review in these actions is stated in Section 205(g) of the Act, 42 U.S.C.A. § 405(g), as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case *de novo*, and if the findings of the Secretary are supported by substantial

---

[1]. The term "disability" is defined in Sections 216(i) and 223 of the Social Security Act, as amended, to mean, "inability to engage in any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."

The 1968 Amendments to the Act imposed the additional requirements that "an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."

evidence, the Courts are bound to accept them. Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968); Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, this provision does not suggest a surrender of "traditional functions," rather it requires a review of the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the administrative finding is supported by substantial evidence and to see that the Administrative Agency does not act aribitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Therefore, the immediate task of this Court on this review is to determine whether the defendant's denial of plaintiff's claim is supported by substantial evidence.

Plaintiff was born on October 30, 1932, and completed the seventh grade and a portion of the eighth grade in school. His work history indicates that he did some farming before entering the Army in August 1949. He served in the Army until May 13, 1952, after which he worked in the following areas of employment: Coal mining for a period of three months; running a machine for a glass company, decorating glasses; trained and worked in automobile body and repair work (painting and refinishing); worked in the housekeeping department of the Greenbrier Hotel; worked for vault companies and as a nightwatchman for a lumber company. He alleges that he became disabled in December 1969, due to a ruptured disc, hearing loss, diabetes and nervousness.

Following is a brief summary of pertinent medical evidence in the record:

Dr. George Henry Guy, general practitioner, Veterans Hospital, Beckley, West Virginia, submitted two reports for the Welfare Department. On September 19, 1969, he diagnosed:

"I Low back syndrome
   Sciatica
   R/O herniated disc

II Hemorrhoids

III Old—healed duodenal ulcer"

Prognosis was "Guarded." The doctor commented that plaintiff was "unable to do any type of work at present because any activity precipitates pain." A radiographic report, dated 7–2–69, accompanying the above report, revealed:

"Lumbo-sacral spine, pelvis, and hip joints: Except for minimal degenerative osteoarthritic changes in the body of L-4, characterized by minute spurring of the anterior and lateral superior margins, the lumbar vertebral segments are normal in size, shape, and contour. The intervertebral spaces are normal. The lumbosacral angle is normal. There is no spondylolisthesis. The apophysial joints are normal. The articular facets between L-5 and S-1 are asymmetrical. The right being in the saggital plane and the left being in the coronal plane. Both sacroiliac joints, the bony pelvis, and both hip joints are normal."

The second report for the Welfare Department by Dr. Guy, dated 1–16–70, revealed essentially the same findings, and the doctor's comment was that plaintiff was "unable to do any type of activity without pain."

Plaintiff was hospitalized from December 30, 1968, to January 4, 1969, at the Greenbrier Valley Hospital. Dr. A. M. Benshoff, Jr., internist, after examination, submitted a final diagnosis of .

"1. Influenza with labyrinthitis and sinusitis, clearing, asymptomatic

2. Chronic ruptured intervertebral disc syndrome, left lumbar, one year

3. Chronic anxiety state and psychoneurosis manifest by nervousness and insomnia."

The doctor stated that "if this man's symptoms should prevent him from doing his usual work then we would seriously consider a neurosurgical referral to a good orthopedic or neurosurgeon who can get consistently good results with disc surgery if not on the first try at least on the second try. There is no reason for a patient with sciatica like this to be permanently disabled from working. It can always be repaired surgically." Dr. Benshoff continued: "We would like to note on this case summary that at the time we were telling this man about ruptured intervertebral discs, the Southern California and Ohio State Rose Bowl Game was on the air and the quarterback for Ohio had had a ruptured intervertebral disc operated and repaired a year prior to the game and he was really taking a great beating from Southern California players in spite of this previous back trouble. This is as it should be. There should be no disability once the ruptured disc is fixed. This patient knows this."

On February 16 and 17, 1970, Dr. E. L. Crumpacker, internist, Greenbrier Clinic, White Sulphur Springs, West Virginia, conducted diagnostic studies on plaintiff. X-ray studies of the lumbosacral spine revealed:

"Early hypertrophic spurring is present at most of the vertebral body margins. This is perhaps more pronounced at the L3–4 interspace level with slightly larger spurs seen anteriorly and laterally on the right. There is no definite decrease in height of this particular interspace, and the remaining interspaces are also normally maintained. Except for the spurring the bony structures are within normal limits. The sacroiliac joints are also normal."

Portions of the summary and conclusions made by Dr. Crumpacker after physical examination, laboratory studies, X-ray studies and electrocardiographic studies are:

"Mr. Cooper's most pressing health problem is the low back pain radiating down the left thigh. X-rays of the lumbar spine reveal only early hypertrophic spurring. The disk spaces are all normal. However, we feel that quite likely that (sic) Mr. Cooper has a herniated disk, probably at L-4. The nature of this disorder was discussed with him and he was advised that a positive diagnosis can be made only with myelograms. Since he is completely disabled we feel that myelograms should be made in order to ascertain whether corrective surgery is indicated. All of this was discussed with him in detail.

"He has a mild diabetes and, of course, diabetic neuropathy should be considered but from the history I do not believe that this is likely a factor.

"His diabetes does not need specific therapy at this time but we suggested that he reduce his weight by at least twenty pounds. * * *"

Although the physical examination revealed that plaintiff "Hears well. Does not lateralize on Weber. Drums (ear) and canals normal," Dr. Crumpacker noted that he had a hearing problem. He reported "20–30 decibel hearing loss to the 4000 cycle level. More marked loss above this level, particularly in the left ear." The doctor related that the "remainder of his studies were within the normal range and all were reviewed with him (plaintiff) in detail."

Plaintiff was examined by Dr. William F. Hillier, Jr., neurosurgeon, Bluefield Sanitarium, Bluefield, West Virginia, on July 13, 1970. After examination, Dr. Hillier noted that the "patient does remarkably well with forward bending despite the complaint of pain in his back. He tends to walk with a foot drop on the left. However, with careful testing in the supine position, I do not believe this

is a true foot drop. Forward bending is remarkably well performed despite a great deal of pain in the back." The doctor's further impression was:

"It is my impression that this man has a probable herniated intervertebral disc, L-5, S-1. Like all the previous examiners, I think he should have a myelogram and if positive, surgery. I certainly do not think that this man, at age 38, with a remediable complaint, should be awarded his Social Security or a permanent partial disability. I think that this could, quite satisfactorily, be eliminated and I am convinced that this man is bound and determined to get disability, either from the Veterans, the Social Security, or some other source and is not remotely interested in the relief of his back and leg pain."

An X-ray report of the lumbar spine accompanying Dr. Hillier's report, dated 7-14-70, noted: "There are minor hypertrophic changes without other specific abnormality."

Dr. Camilo Balacuit, Jr., Veterans Hospital, Beckley, West Virginia, submitted a report which summarizes a hospitalization period of 3-8-71 to 3-30-71, pertinent portions of which reveal: The initial phase of his hospitalization was concentrated on treating his diabetes mellitus. * * * Within the next few days his fasting blood sugar came down to normal limits." Concerning plaintiff's back complaints, Dr. Balacuit stated:

"The orthopedic consultation revealed evidence of protruding disc at L-5, S-1 with nerve involvement. It was strongly recommended that the patient be referred to an orthopedic center for laminectomy. When he was confronted with the possibility of a surgical procedure to his back, the patient refused, claiming that he would have to talk it over with his wife. The patient was made to understand that the procedure was mainly to alleviate the neurologic complication of his back condition, and that only symptomatic treatment could be given to alleviate his

osteoarthritis. With the understanding that the patient would come back sooner for surgical intervention to his back if and when he decided in favor of it, and with an appointment to come back in 90 days to see the ENT consultant again for his ear, the patient was discharged * * *. On discharge the patient was advised against heavy muscular activity, including lifting heavy objects. He was also advised against seeking gainful employment which will *aggravate his back condition.* (Emphasis added).

Dr. George L. Fischer, specialist in internal medicine and diplomate of the American Board of Internal Medicine, appeared as a medical advisor at the plaintiff's hearing before the hearing examiner. After hearing testimony and reviewing the medical records, Dr. Fischer concluded that plaintiff, in his present condition, with his present impairments, could perform sedentary work and possibly light work if it did not involve lifting too much weight. Concerning the remedial surgery, he noted that his research revealed "In one series of cases I was able to find there was one death in 7,000 cases. The success of this procedure, from my review of the literature, is 60% excellent results, 30% good results, and 10% poor results. * * According to Campbell's Textbook of Operative Orthopedics, he allows his patients to return to sedentary work in one month, and heavy work in three months."

█ It has long been established that a remediable ailment cannot be the basis of a claim for disability benefits under the Social Security Act. Bradey v. Ribicoff, 298 F.2d 855 (4th Cir. 1962); Daniels v. Finch, 318 F.Supp. 559 (W.D. Va.1970). "An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity." Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967). This is especially true when, as here, it is perfectly clear from the evidence that a

positive approach is taken by the doctors on the remedial procedure and evidence is offered as to the risk involved and the prospects of recovery within a reasonable time subsequent to such remedial procedure.

We wish to note that this case is different on the record from Stephens v. Ribicoff, 307 F.2d 304 (4th Cir. 1962), in which the Court noted: "The psychiatrist to whom the Secretary sent Stephens confirmed Dr. Poole's diagnosis of the illness (neurocirculatory asthenia), but he was not asked and did not express an opinion as to the nature and extent of the treatment that could be given this claimant or the prospects for recovery within a reasonable time. In the absence of testimony on this point one cannot make a judgment as to remediability." The *Stephens* case was remanded for further development of the question of remediability. In this case, Dr. Benshoff specifically stated "There is no reason for a patient with sciatica like this to be permanently disabled from working. *It can always be repaired surgically. * * * There should be no disability once the ruptured disc is fixed.*" (Emphasis added). Dr. Hillier, following his examination of 7–13–70, definitely recommended surgery if a myelogram were positive. He further stated that "to carry on with further examination and tests of this individual (plaintiff), since it is obvious that he is not remotely interested in doing anything about his back, is not advisable at this time." Dr. Balacuit reported that "it was strongly recommended that the patient (plaintiff) be referred to an orthopedic center for laminectomy. Dr. Fischer, after research on the matter, quoted the previously mentioned statistics which favor remedial surgery. The record in this case clearly establishes, as did the record in Ward v. Celebrezze, 311 F.2d 115 (5th Cir. 1962), that the medical evidence "clearly and unequivocally showed that surgery to treat a ruptured disc would substantially improve the claimant's ability to work * * *."

██ Of course, not every refusal to submit to corrective medical treatment necessarily requires a denial of benefits, Purdham v. Celebrezze, 349 F. 2d 828 (4th Cir. 1965); Ratliff v. Celebrezze, 338 F.2d 978 (6th Cir. 1964), however, with the overwhelming evidence in the instant case to the effect that corrective surgery is strongly recommended by the examining and treating physicians and that they registered no apprehension whatsoever as to plaintiff's successful recovery, we feel that the Secretary's denial of his claim must be upheld.

██ As to plaintiff's alleged disability due to hearing loss, diabetes and nervousness, Dr. Guy and Dr. Crumpacker found that he hears well, although some trouble with the ears was noted. Dr. Crumpacker noted mild diabetes which "does not need specific therapy at this time." He felt that plaintiff's transient hypertension and diabetes needed only weight reduction. Dr. Balacuit treated him for diabetes and noted that "within the next few days his fasting blood sugar came down to normal limits." While some of the doctors mentioned plaintiff's complaint of nervousness, there was no intimation at all that it was in any way disabling.

The record further discloses that, although plaintiff's impairments precluded his performing work in most of his previous occupations, he retained the capacity to perform work of a sedentary to light nature. In regard to this, the testimony of Mr. Craig Colvin, a well qualified vocational expert, was taken. Mr. Colvin testified that plaintiff retained the ability to resume work that he had previously done in a glass factory, as well as other jobs such as nightwatchman; prison guard, however, the evidence appears to show that his limited education would restrict this employment to one particular institution; and work as a small electronic component assembler. The vocational expert testified that these jobs not only exist in the national economy, but also exist in the area near plaintiff's residence.

■ It is noted that plaintiff's attorney, in his brief submitted September 21, 1971, states that the Veterans Administration awarded plaintiff benefits on July 7, 1971. Such determinations of disability, however, from other governmental agencies are of little probative value in cases under the Social Security Act, since the requirements for disability vary greatly under the different legislative programs. It is well established that a finding of disability by another government agency is neither binding on the Secretary nor this Court. Ferrell v. Gardner, 260 F.Supp. 996 (S. D.W.Va.1966).

Therefore, considering the record as a whole, we cannot say that the Secretary's findings are not supported by substantial evidence. Accordingly, the defendant's motion for summary judgment must be granted and the plaintiff's like motion must be denied.