Bennie A. MERCER, Plaintiff,

v.

Forrest David MATHEWS, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 75–134.

United States District Court,
E. D. Kentucky,
Pikeville Division.

Nov. 26, 1975.

Lawrence R. Webster, Pikeville, for plaintiff.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., for defendant.

## MEMORANDUM OPINION AND ORDER

HERMANSDORFER, District Judge.

The above styled action has been brought under 42 U.S.C. § 405(g) for review of a final decision of the Secretary of Health, Education and Welfare in which plaintiff's entitlement to disability insurance benefits under Sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423, was found to have ceased. Both parties have moved for summary judgment pursuant to Rule 56, F.R.C.P.

Plaintiff is presently a thirty-seven year old male, who is the possessor of an eleventh grade education, but no specialized vocational training (Tr. 55). His employment history consists of jobs as belt man in a coal mine (Tr. 56), a heavy equipment operator (Tr. 57), a truck driver (Tr. 58–59), and a foundry worker (Tr. 85).

On September 2, 1970 plaintiff filed his application for benefits, alleging that he became disabled on April 2, 1970 because of a ruptured disc and sciatic and other nerve involvement (Tr. 99). A hearing examiner, considering plaintiff's claim *de novo*, found, on June 24, 1971, that plaintiff was entitled to benefits on the basis of a probably herniated nucleus pulposus for a period commencing with April 2, 1970 (Tr. 177–78). However, following a continuation hearing conducted on October 1, 1974 an Administrative Law Judge, whose determination became the final decision of the Secretary upon approval by the Appeals Council (Tr. 4), found that plaintiff's condition had so improved by December, 1972 that he had regained the capacity for light and sedentary forms of substantial gainful activity. Consequently, plaintiff's entitlement to disability insurance benefits was held to have ceased as of February, 1973 (Tr. 8–17).

■ The scope of the Court's review of this decision to terminate, as with any final decision of the Secretary under 42 U.S.C. § 405(g), is limited to determining whether the findings and conclusions of the Secretary are supported by substantial evidence, and whether the proper legal criteria were employed in the decision-making process. *Ingram v. Richardson*, 471 F.2d 1268, 1271 (6th Cir. 1972); *Walston v. Gardner*, 381 F.2d 580, 585 (6th Cir. 1967).

■ The burden lay squarely upon plaintiff to establish the continuous nature of the disability. *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972). However, the Secretary's concession as to plaintiff's obvious preclusion from the types of work he had previously performed was sufficient to shift the burden to the Secretary to adduce evidence that plaintiff could engage in substantial work with his lessened capacity, and that jobs are existent within the national economy which plaintiff could carry out. *Montgomery v. Weinberger*, 514 F.2d 1211, 1212 (6th Cir. 1975); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975).

■ In relation to the Secretary's burden, the testimony of Phyllis C. Shapero, a vocational consultant, was elicited (Tr. 79–94). Her enumeration of jobs was rendered in response to hypothetical questions posed by the Administrative Law Judge, who asked her to assume plaintiff's capability to perform light and sedentary work (Tr. 87). For the Secretary to then cite Mrs. Shapero's testimony as evidence of plaintiff's capacity to perform these jobs (Tr. 14–15; Memorandum for Defendant, 4–5, 8–9) requires a tautology of reasoning which is erroneous as a matter of law. *Myers v. Weinberger, supra* at 294. The particular vocational testimony in question is evidence of nothing more than the availability of light and sedentary jobs in the national economy for a man of plaintiff's age, background, and experience. Any determination as to plaintiff's capability for performing those jobs must have been made on the basis of substantial evidence elsewhere in the record.

Medical evidence adduced prior to the pivotal December, 1972 period, tends to support plaintiff's contention that he had been continually disabled since April 2, 1970. Dr. Curwood R. Hunter, a neurological surgeon, examined plaintiff on January 27, 1971 and again on March 10, 1971 and his findings included: marked restriction of straight leg raising on the left, and a moderate restriction on the right; a difference in knee reflexes and an absence of ankle reflexes; paraspinal muscle spasm, greater on the left side; restriction of back bending, enabling plaintiff to only reach a point where his fingertips were fifteen inches from the floor; narrowing of the lumbosacral intervertebral disc space; some cupping or beveling of the inferior surface of the fourth lumbar vertebra, and the superior and inferior surfaces of the fifth lumbar vertebra; mild straightening of the lumbar lordotic curve; and circumferential decrease of the right thigh (Tr. 215–19). The physician diagnosed acute ruptured intervertebral disc at the L4–5 interspace on the left side (Tr. 219), and commented that plaintiff was totally disabled for any type of occupation. He particularly was unable to perform work requiring lifting, stooping, bending from right to left, or involving any type of manual labor (Tr. 220).

Dr. Hunter was optimistic concerning plaintiff's chances for recovery through surgery. Based upon his own statistical probabilities, the doctor stated that the possibility of success, and plaintiff's being able to return to gainful occupation was "excellent", in the range of 90–95%. He added that he thought plaintiff's pain, which he characterized as the source of plaintiff's disability, could be at least temporarily eliminated by surgery (Tr. 221–22). Dr. Hunter stated unequivocally that, in his opinion, conservative treatment would not correct plaintiff's condition, and he strongly recommended surgery as the only means of restoring plaintiff to an employable state (Tr. 225).

Dr. Kearns R. Thompson, an orthopedic surgeon, examined plaintiff on March 9, 1972 and reported these findings, *inter alia:* a body list of five to ten degrees forward and five degrees to the right; flattening of the lumbar spine with an absence of the usual lordotic alignment; fairly good rotary motions, but a sixty to seventy per cent restriction in lateral bending; extension zero; forward flexion only to the point where he could reach the uppermost portion of his shins; muscle spasm, and trunk deviation to the right; positive straight-leg raising from the sitting position; and a fifty to sixty per cent narrowing of the L–S interspace (Tr. 229–30). Rather than a ruptured disc, degenerative disc disease at the L–S junction, producing low back pain, was the diagnosis made by Dr. Thompson, who stated further that although weight reduction and exercise might help plaintiff, he would probably have exacerbations and remissions of symptoms without the performance of a spinal fusion (Tr. 230).

The Administrative Law Judge's determination, however, was primarily based upon three medical reports prepared from examinations conducted between December, 1972 and December, 1973. The first of these reports, from Dr. T. Rothrock Miller, an orthopedic surgeon, was accorded particularly heavy weight by the finder of fact. Dr. Miller's report from his December 15, 1972 examination of plaintiff included these findings: straight spine, with a normal lumbar lordosis, and no paravertebral muscle spasm; forward bending was seventy five per cent of normal, while lateral and backward bending were normal; straight leg raising was positive at ninety degrees on the right and negative on the left; diminished sensation to pin pricks in both legs, except the inner right calf; essentially normal x-rays of the lumbar spine, except for a moderate narrowing at the L5–S1 interspace; and no localized sclerotic changes. Dr. Miller recommended a myelogram and sur-

gery if indicated, but stated that at that time, plaintiff's functional limitations were insignificant. He asserted that although plaintiff was possibly incapable of heavy strenuous physical labor, he was certainly capable of moderate or light physical activity (Tr. 248–49).

Dr. William M. Ewing, also an orthopedic surgeon, noted that on January 22, 1973, plaintiff's physiological curves were moderately increased; motion in his lower back was limited to fifty per cent of normal in all directions; tendon reflexes were active at the ankle and knees; straight leg raising was negative on the right and mildly positive on the left; and LaSegue signs were negative bilaterally. X-rays showed a marked narrowing of the lumbosacral joint. Dr. Ewing diagnosed a probable post-traumatic ruptured lumboscral disc, producing what the doctor characterized as a twenty five per cent disability to the body as a whole (Tr. 251–52). The Secretary implies that this twenty five per cent rating is evidence of plaintiff's ability to engage in substantial gainful activity (Memorandum for Defendant at 8), but a virtually identical contention was considered and expressly rejected in *Ratliff v. Celebrezze*, 338 F.2d 978, 981–82 (6th Cir. 1974). Such a characterization is certainly of little or no benefit to the Secretary in sustaining his burden of showing what types of work plaintiff was capable of performing. *Id.*

Dr. Russell H. Meyers, a neurosurgeon, examined plaintiff on December 22, 1973 and reported these findings, *inter alia:* no spasm of paraspinal muscles, loss of lumbar physiological curve, or reduction in the reciprocal innervation of the paravertebral muscles; ranges of motion limited to one-half normal, forward, three-fifths normal bilaterally, full rotation, and one-fifth normal upon dorsal extension; paravertebral muscles were not found to be tender, but the L5–S1 interspace, left sacroiliac joint, and the left sacrosciatic notch were "exquisitely tender to digital pressure", and to a lesser degree, the courses

of the left sciatic nerve and its peroneal branch were also tender; definite hypesthesia implicating the entire left foot and most of the left leg; and a narrowing of the L5–S1 interspace. Dr. Meyers diagnosed radiculitis of the first sacral nerve root, mainly on the left side, which was probably attributable to a herniation of the intervertebral disc at the L5–S1 interspace (Tr. 260–61). The physician stated that he regarded plaintiff "as 100% disabled for the performance of the types of work which he has implemented for the past several years" (Tr. 216).

In regard to Dr. Meyers' conclusion, the Secretary again asserts that the appraisal cannot support a finding of continued disability (Memorandum for Defendant at 8) and implies (Tr. 14) that the report constitutes evidence of plaintiff's capacity for alternative forms of employment. Such a construction of Dr. Meyers' opinion would appear to be expressly contrary to the physician's intended portrayal of plaintiff's condition, as indicated by the following prognosis:

"It is clear that continuing the conservative line of treatment that has been followed up to the present will bring no effectual rewards for either vocational or avocational pursuits. From this point on, the only therapy which carries any prospect of relief and resumption of wage-earning endeavors rests with surgical intervention. In this, I fully concur with Doctor Curwood Hunter, who, reportedly, was prepared to go ahead with such operation in February, 1972." (Tr. 261)

Dr. Meyers' description of pain and tenderness exhibited by plaintiff in December, 1973 is consistent with the previous testimony of Dr. Thompson who stated that plaintiff's complaints of lower back pain, evidenced by muscle spasm and trunk deviation, were "bona fide" (Tr. 244–45), lending credence to plaintiff's own testimony concerning steadily worsening pain, radiating through his leg, and aggravated by prolonged walk-

ing, standing, or sitting (Tr. 65–71): It is significant to note in this regard that Mrs. Shapero, when asked to assume that plaintiff's back condition caused constant pain, aggravated by substantial activity, testified that she knew of no jobs which would be available to him (Tr. 93). See, *Glass v. Secretary of Health, Education and Welfare,* 517 F.2d 224 (6th Cir. 1975); *Noe v. Weinberger,* 512 F.2d 588 (6th Cir. 1975).

Support for the Administrative Law Judge's decision which could arguably be deemed to be "substantial evidence" could only be found in the report from Dr. Miller, whose findings, and more strikingly, whose appraisal of plaintiff's capacity for work[1], conflict markedly with the contents of reports from other experts. Ordinarily, the resolution of conflicts in the medical evidence is a function reserved exclusively for the Secretary in his capacity as finder of fact. *Wokojance v. Weinberger,* 513 F. 2d 210, 212 (6th Cir. 1975); *Floyd v. Finch,* 441 F.2d 73, 76 (6th Cir. 1971). The Court has no desire to improperly inject itself into this exclusively administrative function by attempting to resolve the particular conflicts in the evidence, but finds simply that the one medical report from Dr. Miller, when viewed against the totality of the evidence of record, including the largely corroborated testimony of plaintiff, does not constitute "substantial evidence", or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"[2] that plaintiff's condition had improved, without surgical intervention, to the point where he was capable of substantial gainful activity on the light and sedentary exertional levels. See generally, *Miracle v. Celebrezze,* 351 F.2d 361, 373 (6th Cir. 1965).

■ The great weight of the evidence supports the premise that plaintiff's condition could be significantly improved by surgical intervention in the form of a spinal fusion. On the other hand, the conservative treatment which has been administered to plaintiff has had little, if any, meaningful remedial effect, and according to various medical prognosticators, offers scant hope of such effect in the future. Thus, an issue is raised as to the consequences of plaintiff's failure to undergo the recommended surgery, in view of 20 C.F.R. § 404.1507, which provides, in relevant part:

"An individual with a disabling impairment which is amenable to treatment that could be expected to restore his ability to work shall be deemed to be under a disability if he is undergoing therapy prescribed by his treatment sources but his impairment has nevertheless continued to be disabling or can be expected to be disabling for at least 12 months. However, an individual who willfully fails to follow such prescribed treatment cannot by virtue of such failure be found to be under a disability. Willful failure does not exist if there is justifiable cause for failure to follow such treatment."

In *Ratliff v. Celebrezze, supra* at 981, Judge McAllister, noting that "[i]t is common knowledge that spinal fusion operations are often dangerous and entail much pain and suffering", held that the appellant's refusal to submit to such an operation, particularly when assurances of success had not been readily made, was not an unreasonable refusal to cooperate in remedial treatment, within the purview of 20 C.F.R. § 404.1502(g), the forerunner of the present § 404.1507. Accord, see *Grizzle v. Cohen,* 297 F. Supp. 790 (W.D.Va.1969); but cf. *Ware v. Finch,* 322 F.Supp. 1282 (W.D.N.C. 1970).

---

[1]. A physician's opinion as to ability or disability for work, while a factor to be considered where supported by clinical findings, is not determinative of the ultimate issue before the Secretary. 20 C.F.R. § 404.1526; *Giddings v. Richardson,* 480 F.2d 652, 655 (6th Cir. 1973).

[2]. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

Unlike the appellant in *Ratliff*, plaintiff in this action has expressed his willingness to undergo the indicated surgery (Tr. 67). His reservations are based strictly upon financial considerations. At least one Court, when confronted with a similar issue, has held:

"If claimant consents to surgery but cannot get it because he is unable to finance it, his condition is not 'remediable' within the meaning of the Act." *Hoover v. Celebrezze,* 235 F.Supp. 147, 150 (W.D.N.C.1964).

See also, *Ratliff v. Celebrezze, supra* at 981, wherein the relatively high cost of the surgery was one factor considered by the Court in finding the claimant's refusal to submit to be reasonable.

The Court has determined that the record does not contain substantial evidence which would support the Administrative Law Judge's finding that plaintiff's condition had so improved by December, 1972 that he was capable of light and sedentary substantial gainful activity. A strong inference may be drawn from the evidence as a whole that plaintiff's disability may likely be remedied by surgical intervention, which plaintiff has not categorically refused to undergo, but rather, which he has put off for purely economic reasons. Since the Secretary has made no express finding as to whether the lack of financial resources constitutes "justifiable cause" for plaintiff's failure to undergo the indicated surgery, and because this issue involves a question of fact for the Secretary, *Simari v. Secretary of Health, Education and Welfare,* 297 F.Supp. 483, 485 (D.Mass.1969), it is the judgment of the Court that this matter be remanded to the Secretary for further proceedings, including, but not limited to, determination of the following issues:

(1) Whether plaintiff's alleged lack of financial resources constitutes "justifiable cause" for his failure to undergo the recommended surgery;

(2) If not, whether plaintiff's conduct amounts to willful failure to follow prescribed treatment, within the meaning of 20 C.F.R. § 404.-1507.

Accordingly, it is ordered that this matter be, and it hereby is, remanded to the Secretary for further proceedings in conformity with this Memorandum Opinion.

It is further ordered that this action be, and it hereby is, stricken from the docket.